# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **TONY C. OSBORNE,** | ) |
| Plaintiff | ) |
| | ) Civil Action No. 2:18cv00031 |
| v. | ) |
| | ) **MEMORANDUM OPINION** |
| **ANDREW SAUL,**[1] | ) |
| **Commissioner of Social Security,** | ) By: PAMELA MEADE SARGENT |
| Defendant | ) United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Tony C. Osborne, ("Osborne"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011, West 2012 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Osborne protectively filed his applications for DIB and SSI on September 23, 2014, alleging disability as of February 1, 2014, based on hepatitis C; back problems; depression; anger problems; and learning problems. (Record, ("R."), at 13, 240-41, 244-47, 264.) The claims were denied initially and upon reconsideration. (R. at 140-42, 147-49, 153-57, 159-64, 166-68.) Osborne then requested a hearing before an administrative law judge, ("ALJ"). (R. at 169-70.) The ALJ held a hearing on June 20, 2017, at which Osborne was represented by counsel. (R. at 29-75.)

By decision dated October 25, 2017, the ALJ denied Osborne's claim. (R. at 13-23.) The ALJ found that Osborne met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 15.) The ALJ found that Osborne had not engaged in substantial gainful activity since February 1, 2014, the alleged onset date.[2] (R. at 15.) The ALJ found that the medical evidence established that Osborne had severe impairments, namely recurrent back strain, depressive disorder and opioid use disorder, but he found that Osborne did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-16.) The ALJ found that Osborne had the residual functional

---

[2] Therefore, Osborne must show that he was disabled between February 1, 2014, the alleged onset date, and October 25, 2017, the date of the ALJ's decision, in order to be eligible for DIB.

capacity to perform simple, routine, repetitive, unskilled medium[3] work that did not require interaction with the general public. (R. at 17.) The ALJ found that Osborne was capable of performing his past relevant work as a tree cutter. (R. at 21.) In addition, based on Osborne's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Osborne could perform, including jobs as an assembler, a packer and an inspector/tester/sorter. (R. at 21-22.) Thus, the ALJ concluded that Osborne was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 22-23.) *See* 20 C.F.R. §§ 404.1520(f), (g) 416.920(f), (g) (2019).

After the ALJ issued his decision, Osborne pursued his administrative appeals, (R. at 234, 325-27), but the Appeals Council denied his request for review. (R. at 1-5.) Osborne then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2019). This case is before this court on Osborne's motion for summary judgment filed February 26, 2019, and the Commissioner's motion for summary judgment filed March 28, 2019.

## II. Facts[4]

Osborne was born in 1983, (R. at 34, 240, 244), which classifies him as a

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2019).

[4] Osborne's only dispute is with respect to the ALJ's assessment of his mental limitations. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Therefore, the court will address the facts relevant to Osborne's mental health.

"younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education[5] and certification in welding. (R. at 265.) Osborne has past work experience as a welder; a fitter helper; a fast food worker; a cleaner; and a tree trimmer helper. (R. at 34-35, 69-70.) Osborne testified that he was ordered to do community service by the court after being charged with conspiracy to commit grand larceny and grand larceny. (R. at 40-41.) He stated that he picked up litter as part of his community service. (R. at 40.) Osborne stated that he participated in counseling for depression and anxiety. (R. at 45.) He stated that he stayed in his room and watched movies all day. (R. at 58.)

John Newman, a vocational expert, also was present and testified at Osborne's hearing. (R. at 68-73.) Newman was asked to consider a hypothetical individual of Osborne's age, education and work history, who had the residual functional capacity to perform simple, routine tasks that did not require interaction with the public. (R. at 70.) He stated that such an individual could perform Osborne's past work as a tree trimmer helper. (R. at 70-71.) Newman stated that such an individual could also perform other light work[6] that existed in significant numbers, such as an assembler, a packer and an inspector/tester. (R. at 71.) Newman was then asked to consider a second hypothetical individual who had the residual functional capacity to perform medium work. (R. at 72.) He stated that such an individual could perform Osborne's past work, as well as the jobs identified at the light exertion level. (R. at 72.) Newman was asked to consider the same hypothetical individual, but who could have no more than occasional contact

---

[5] Osborne reported that he attended special education classes, which was confirmed by school records. (R. at 265, 295.)

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2019).

with co-workers and supervisors. (R. at 72.) He stated that such an individual would not be able to perform Osborne's past work as a tree trimmer helper. (R. at 72.) Newman was asked to consider the same hypothetical individual who would be limited to light work. (R. at 72.) He stated that the individual could perform the jobs previously identified. (R. at 72.) Newman stated that there would be no jobs available should the individual be restricted from having contact with co-workers and supervisors and who would be not be expected to reliably report for work shifts or reliably complete work shifts. (R. at 72-73.)

In rendering his decision, the ALJ reviewed medical records from Howard S. Leizer, Ph.D., a state agency psychologist; David Deaver, Ph.D., a state agency psychologist; Dr. Uzma Ehtesham, M.D.; Melinda M. Fields, Ph.D., a licensed psychologist; Norton Community Hospital; The Health Wagon; Wellmont-Mountain View Regional Medical Center, ("Mountain View"); Norton Community Physicians Service, ("Community Physicians"); and Appalachia Family Health.

The record shows that Dr. Uzma Ehtesham, M.D., treated Osborne from January 2009 through December 2011 for his complaints of depression, anxiety and anger issues. (R. at 328-55, 763-812.) In April 2010, Dr. Ehtesham diagnosed bipolar II disorder, and assessed Osborne's then-current Global Assessment of Functioning, ("GAF"),[7] score at 60.[8] (R. at 784.) In April 2011, she diagnosed bipolar I disorder and assessed Osborne's then-current GAF score at 58. (R. at 351.) Throughout this time period, Osborne routinely reported that his symptoms

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

were improved and stable, stating that medication helped. (R. at 332, 334, 340, 342, 344, 767, 777, 779, 785, 787, 789, 791, 793, 795, 797, 801, 805, 811.) Dr. Ehtesham repeatedly found that Osborne had good to fair hygiene and grooming; his eye contact was described as maintained to intermittent; his speech ranged from normal to spontaneous; his affect was anxious; his mood and thought were congruent; his insight ranged from good to fair; he had intact judgment; his thought process was goal-directed; and his reality testing was improved. (R. at 328, 330, 332, 334, 336, 338, 340, 342, 344, 349, 352, 354, 763, 765, 767, 769, 771, 773.)

On April 7, 2010, Osborne reported to Dr. Tiffani M. Nichols, D.O., a physician with Community Physicians, that his anxiety was stable. (R. at 871.) On March 24, 2011, Osborne reported that his anxiety was well-controlled.[9] (R. at 842.) Dr. Nichols reported that Osborne was calm, appropriate, very talkative and made appropriate eye contact. (R. at 843.) On July 13, 2011, Osborne reported to Dr. Nichols that his anxiety was stable. (R. at 829.) On August 25, 2011, Osborne reported that his symptoms of anxiety had improved with medication. (R. at 825.) Dr. Nichols reported that Osborne was oriented; his insight and judgment were intact; and his affect was normal. (R. at 827.) She diagnosed anxiety. (R. at 827.) On October 26, 2011, Osborne complained of anxiety, which was worsened by stress. (R. at 816.) Osborne stated that his symptoms were improving. (R. at 816.) Dr. Nichols reported that Osborne was oriented; his insight and judgment were intact; and his affect was normal. (R. at 818.)

On March 3, 2015, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Osborne had a nonsevere affective disorder. (R. at 81-82.) He found that Osborne

---

[9] Dr. Nichols noted that Dr. Ehtesham was treating Osborne for his complaints of anxiety. (R. at 842.)

had no restrictions on his activities of daily living or in maintaining social functioning; mild restrictions on his ability to maintain concentration, persistence or pace; and he had experienced no repeated episodes of extended-duration decompensation. (R. at 82.)

On March 9, 2015, Osborne saw Mary Beth Bentley, N.P., a nurse practitioner with The Health Wagon, for complaints of anxiety and depressed mood. (R. at 663.) Bentley reported that Osborne's cognitive function was intact; he made good eye contact; his judgment and insight were good; his speech was clear; he had no suicidal ideation or delusions; and his thought process was logical, and goal-directed. (R. at 663.) Bentley diagnosed depressive disorder, not elsewhere classified, and prescribed Zoloft. (R. at 664.) On March 24, 2015, Osborne denied anxiety, but complained of depressed mood. (R. at 659.) He stated that Zoloft helped his symptoms of depression, but he had missed a few doses. (R. at 658.) Bentley reported that Osborne's cognitive function was intact, and he made good eye contact. (R. at 658.) On May 19, 2015, Osborne denied anxiety and depressed mood and stated that Zoloft improved his mood. (R. at 656.) Bentley reported that Osborne's cognitive function was intact; he made good eye contact; his judgment and insight were good; his speech was clear; this thought content was without suicidal ideation and delusions; and his thought process was logical, and goal-directed. (R. at 656.) Bentley diagnosed depressive disorder, not elsewhere classified. (R. at 656.)

On June 18, 2015, Melinda M. Fields, Ph.D., a licensed psychologist, evaluated Osborne. (R. at 487-92.) Osborne reported anger issues, moodiness and depression. (R. at 487.) He stated that he would get depressed if he did not have something to do. (R. at 487.) Osborne stated that he spent his days at home with his girlfriend watching television and movies. (R. at 488.) Fields reported that Osborne

was cooperative with a euthymic mood, but exhibited low frustration tolerance with agitation during the administration of intellectual testing. (R. at 489.) Osborne had adequate eye contact; adequate grooming; coherent and relevant speech; organized and logical stream of thought; normal thought content and perception; broad affect; impaired judgment; and limited insight. (R. at 487, 489-90.) He had mildly deficient immediate memory; impaired recent and remote recall; moderately deficient persistence; moderately slow pace; and adequate concentration. (R. at 489-90.) Osborne interacted in a moderately deficient fashion as evidenced by low frustration tolerance, need for prompting and moderately deficient persistence. (R. at 490.)

The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Osborne obtained a full-scale IQ score of 51, and his verbal comprehension, perceptual reasoning, working memory and processing speed scores ranged from 56 to 61. (R. at 490.) Fields, however, concluded that these scores were invalid because Osborne's performance was not optimal, and his scores were inconsistent with his history of adaptive functioning, including certifications in welding and heavy equipment operation, previous management of finances and performance in high school based on grades and class ranking. (R. at 491.) Fields diagnosed depressive disorder and opioid use disorder. (R. at 491.) Fields noted that Osborne reported stress related to gainful employment and would likely benefit from the structure and support of a workplace setting such as a sheltered employment. (R. at 491.) She also indicated that "[a]n exacerbation in mental health symptoms is possible if faced with typical stressors inherent in gainful employment." (R. at 491.) Fields opined that Osborne could manage his own funds. (R. at 491.)

On July 22, 2015, David Deaver, Ph.D., a state agency psychologist,

completed a PRTF, indicating that Osborne had a severe affective disorder. (R. at 109-10.) He found that Osborne had mild restrictions on his activities of daily living; moderate restrictions in maintaining social functioning and in maintaining concentration, persistence or pace; and he had experienced no repeated episodes of extended-duration decompensation. (R. at 110.)

That same day, Deaver completed a mental assessment, finding that Osborne had a markedly limited ability to carry out detailed instructions and to interact appropriately with the general public. (R. at 112-14.) He found that Osborne was moderately limited in his ability to remember locations and work-like procedures; to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 112-14.) Deaver opined that Osborne was not significantly limited in his ability to understand, remember and carry out very short and simple instructions; to sustain an ordinary routine without special supervision; to make simple work-related decisions; and to ask simple questions or request assistance. (R. at 112-13.) He opined that Osborne could perform simple, unskilled work that did not require public contact. (R. at 114.)

On September 28, 2015, Osborne denied anxiety and depressed mood and

stated that Zoloft improved his mood. (R. at 654-55.) Bentley reported that Osborne's cognitive function was intact; he made good eye contact; his judgment and insight were good; his speech was clear; this thought content was without suicidal ideation and delusions; and his thought process was logical and goal-directed. (R. at 654.) Bentley diagnosed depressive disorder, not elsewhere classified. (R. at 654.)

On October 7, 2015, Osborne saw Crystal Burke, L.C.S.W., a licensed clinical social worker with Appalachia Family Health, for complaints of agitation, anger, depressed mood and social isolation. (R. at 695.) Burke reported that Osborne's appearance was disheveled; his mood was mildly depressed; he had an appropriate affect; he made appropriate eye contact; his thought process was rambling; and he had poor judgment and insight. (R. at 695.) Burke diagnosed unspecified mood disorder; intermittent explosive disorder; opioid dependence, in remission; and personality disorder, unspecified. (R. at 695.) On November 17, 2015, Osborne reported stress related to financial stressors. (R. at 693.) He stated that he had been promised a couple of jobs from a former employer, but it had not worked out. (R. at 693.) Osborne reported getting angry, but that he was not acting on it. (R. at 693.) He reported that his relationship with his girlfriend and his mood had improved with anger management. (R. at 693.) Burke reported that Osborne's mood was mildly depressed; he was mildly anxious; he made adequate eye contact; his thought process was scattered; and he had fair judgment and insight. (R. at 693.)

On January 14, 2016, Osborne complained of depression, low energy, difficulty sleeping and stress related to legal issues. (R. at 701.) He stated that he did not get his antidepressant prescriptions filled due to lack of money. (R. at 701.) Burke reported that Osborne had poor appearance and grooming; his mood was

depressed; he had a congruent affect; he made adequate eye contact; his thought process was scattered; and he had fair judgment and insight. (R. at 703.) On February 29, 2016, Osborne reported stress due to legal issues. (R. at 698.) He also reported that he had been a "little anxious" with an irritable mood. (R. at 698.) Osborne reported that his medication was helping and that he was less withdrawn. (R. at 698.) Burke reported that Osborne's mood was depressed; he had a congruent affect; he made adequate eye contact; his thought process was scattered; and his judgment and insight were limited. (R. at 700.) Osborne was next seen by Burke on January 5, 2017. (R. at 705-08.) Osborne complained of irritability, stress and anxiety. (R. at 705.) Burke reported that Osborne's mood was mildly anxious; he had a congruent affect; he made adequate eye contact; his thought process was intact; and he had fair judgment and insight. (R. at 707.)

On March 2, 2017, Osborne reported that he had been picking up litter as part of his community service obligation. (R. at 709.) Otherwise, he reported that, other than performing his community service, he isolated himself. (R. at 709.) Burke reported that Osborne's mood was mildly depressed; he had a congruent affect; he made appropriate eye contact; his thought process was intact; and he had fair judgment and insight. (R. at 711.) Burke diagnosed intermittent explosive disorder and opioid dependence, in remission. (R. at 711.) That same day, upon request, Osborne was given a work excuse for that day due to his medical appointment. (R. at 721-22.)

On March 9, 2017, Burke completed a mental assessment, indicating that Osborne had a satisfactory ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to maintain attention and concentration; to understand, remember and carry out detailed and simple job instructions; to maintain personal appearance; to behave in an

emotionally stable manner; and to relate predictably in social situations. (R. at 727-29.) She also opined that Osborne had a seriously limited ability to deal with work stresses; to function independently; to understand, remember and carry out complex job instructions; and to demonstrate reliability. (R. at 727-28.) Burke found that Osborne would be absent from work more than two days a month due to his impairments. (R. at 729.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011, West 2012 & Supp. 2019); *McLain v. Schweiker*, 715 F.2d 866, 868-

69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Osborne argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 4-5.) In particular, Osborne argues that the ALJ erred by failing to give controlling weight to the assessment of his treating mental healthcare provider, Burke, and psychologist Fields's opinion. (Plaintiff's Brief at 5.) He also argues that the ALJ erred by giving controlling weight to the opinions of the state agency psychologists. (Plaintiff's Brief at 5.) Osborne contends that the state agency psychologists' assessments were "stale and outdated." (Plaintiff's Brief at 5.)

Osborne argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 4-5.) The ALJ found that Osborne had the residual functional capacity to perform simple, routine, repetitive, unskilled medium work that did not require interaction with the general public. (R. at 17.)

In making this residual functional capacity finding, the ALJ stated that he

was giving "little weight" to psychologist Fields's June 2015 opinion and Burke's March 2017 assessment and giving greater weight to the state agency consultants' medical assessments. (R. at 21.) While the ALJ, in general, is required to give more weight to opinion evidence from examining versus nonexamining medical sources, the ALJ is not required to give controlling weight to the opinions of a treating source. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (2019). In fact, an opinion from a treating physician will be accorded significantly less weight if it is "not supported by clinical evidence or if it is inconsistent with other substantial evidence…." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). Furthermore, the ALJ is entitled to rely on a nonexamining source's medical opinion where that opinion is supported by the record as a whole. *See Alla Z. v. Berryhill*, 2018 WL 4704060, at *11 (W.D. Va. Sept. 30, 2018); *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (2019).

The ALJ noted he was giving "little weight" to Fields's June 2015 opinion because it "suggested [Osborne] did not put forth his best effort." (R. at 21.) Testing revealed that Osborne had a full-scale IQ score of 51, and verbal comprehension, perceptual reasoning, working memory and processing speed scores range from 56 to 61. (R. at 490.) Fields, however, concluded that these scores were invalid because Osborne's performance was not optimal and were inconsistent with his history of adaptive functioning, including certifications in welding and heavy equipment operation, previous management of finances and performance in high school based on grades and class ranking. (R. at 491.) As noted by the ALJ, the medical evidence indicates that medication and counseling generally were effective. (R. at 20, 654, 656, 658, 693, 698, 709.) Osborne generally had causal appearance and grooming; adequate eye contact; full orientation; intact thought process; fair insight and judgment; no paranoia or delusions; and no suicidal or homicidal ideation. (R. at 654, 656, 658, 663, 700,

707, 711.)

The ALJ also gave "little weight" to Burke's March 2017 assessment because it was not consistent with Osborne's presentation as noted in treatment notes, and it was inconsistent with Osborne's reported activities. (R. at 21.) The Commissioner argues that, as a licensed clinical social worker, Burke is not considered an acceptable medical source as defined by the Act. *See* 20 C.F.R. §§ 404.1502(a), 416.902(a) (2019) (defining acceptable medical sources as licensed physicians, licensed or certified psychologists, and – for limited purposes – licensed optometrists, licensed podiatrists, qualified speech-language pathologists, licensed audiologists, licensed advanced practice registered nurses and licensed physician assistants). Evidence from such nonacceptable medical sources cannot be used to establish the existence of a medically determinable impairment, but they may "provide evidence, including opinion testimony, regarding the severity of the claimant's impairments and [how] such impairment[s] affect the individual's ability to function." *Ingle v. Astrue*, 2011 WL 5328036, at *3 (W.D. N.C. Nov. 7, 2011) (citing Social Security Ruling, ("S.S.R."), 06-03p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West Supp. 2013)); 20 C.F.R. §§ 404.1513(d), 416.913(d)). To determine the weight given to the opinion of a nonacceptable medical source, the ALJ must consider: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. *See Beck v. Astrue*, 2012 WL 3926018, at *12 (S.D. W. Va. Sept. 7, 2012) (citing S.S.R. 06-03p).

While Burke treated Osborne regularly between approximately October 2015 and March 2017, the ALJ found that her assessment was inconsistent with Osborne's presentation as documented in Osborne's treatment notes and his reported activities. (R. at 21.) *See* 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4) (the more the opinion is consistent with the record and supported by an explanation, the more weight the ALJ will give that opinion). As detailed above, Osborne's mental examinations contained few negative findings. (R. at 654, 656, 658, 663, 700, 707, 711.) In fact, it was routinely reported that Osborne's cognitive function was intact; he made good eye contact; his insight and judgment were good to fair; his speech was clear; and his thought process was logical and goal-directed. (R. at 654, 656, 658, 663, 707, 711.) In addition, Osborne reported that his symptoms improved with counseling and medication. (R. at 654-56, 658, 693, 698.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Osborne reported community service work in the form of litter clean up and that his days consisted of watching television and movies with his girlfriend. (R. at 488, 709.) Furthermore, in November 2015, Osborne reported that he had been promised a couple of jobs, but they had not worked out. (R. at 693.) At his medical appointment in March 2017, Osborne requested a work excuse for that day. (R. at 721-22.)

The ALJ gave "great weight" to the opinion of the state agency psychologist, Deaver, who opined that Osborne could perform simple, unskilled work without public contact. (R. at 21, 114.) The ALJ noted that Deaver's assessment was well-supported and consistent with the totality of the evidence. (R. at 21.) Under the regulations, the ALJ was entitled to rely on the state agency psychologists' and physicians' assessments. *See* 20 C.F.R. §§ 404.1513a(3)(b)(1), 416.913a(3)(b)(1) (2019) ("State agency medical or psychological consultants are highly qualified

and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2013 Supp.) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources").

Osborne argues that the ALJ should have given Deaver's assessment less weight because it was "stale and outdated," because he did not have the benefit of reviewing the up-to-date medical evidence, including Burke's assessment. (Plaintiff's Brief at 5.) The simple fact that those opinions came later in time than the state agency opinion does not mean that they should be accorded greater weight. As the Third Circuit has noted, "[B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); *see also Stricker v. Colvin*, 2016 WL 543216, at *3 (N.D. W. Va. Feb. 10, 2016) ("[A] lapse of time between State agency physician opinions and the ALJ's decision does not render the opinion stale.")

Also, as noted by the ALJ, medication effectively treated Osborne's depressive symptoms. (R. at 20, 654, 656, 658, 698, 709.) Osborne also reported improvement with counseling stating, "[a] few things ha[d] improved with anger management, relationship and mood." (R. at 693.) The ALJ also noted that that

Osborne's presentation on examination with his treating providers also was consistent with Deaver's assessment. (R. at 21.) On examination, although Osborne had a mildly anxious or depressed mood, he generally had casual appearance and grooming; he made adequate eye contact; he had intact thought process; and he had fair insight and judgment. (R. at 654, 656, 658, 663, 700, 707, 711.) The ALJ pointed out that, although Osborne complained of cognitive problems, the consultative examination showed that Osborne's IQ results were invalid. (R. at 20, 491.) Deaver also provided a sufficient explanation in support of the mental limitations that he assessed. (R. at 113-14.) *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (the more the opinion is supported by an explanation, the more weight the ALJ will give to that opinion.) In making his assessment, Deaver referenced the examining psychologist's opinion, noting that, although Osborne's concentration appeared adequate, his persistence appeared moderately deficient. (R. at 113.) Deaver noted that Osborne reported leaving jobs due to being stressed out and that his mood during examination became increasingly agitated over the progression of testing. (R. at 113.) Based on this, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence.

I note that, prior to Osborne's alleged onset of disability date, he was treated by Dr. Ehtesham from January 2009 through December 2011[10] for complaints of depression, anxiety and anger issues. (R. at 328-55, 763-812.) Although Dr. Ehtesham diagnosed bipolar disorder and assessed Osborne's GAF scores at 58 and 60, indicating moderate difficulty in social, occupational or school functioning, she repeatedly found that Osborne had good to fair hygiene and grooming; his eye contact was described as maintained to intermittent; his speech ranged from normal

---

[10] The ALJ found that Osborne had not engaged in substantial gainful activity since February 1, 2014, the alleged onset date. (R. at 15.)

to spontaneous; his affect was anxious; his mood and thought were congruent; his insight ranged from good to fair; he had intact judgment; his thought process was goal-directed; and his reality testing was improved. (R. at 328, 330, 332, 334, 336, 338, 340, 342, 344, 349, 352, 354, 763, 765, 767, 769, 771, 773.) In addition, throughout this time period, Osborne routinely reported that his symptoms were improved and stable, stating that medication helped. (R. at 332, 334, 340, 342, 344, 767, 777, 779, 785, 787, 789, 791, 793, 795, 797, 801, 805, 811.) Throughout 2010 and 2011, Dr. Nichols reported that Osborne's anxiety was controlled with medication, and she found that he was oriented, he had intact insight and judgment and a normal affect. (R. at 816, 818, 825, 827, 829, 842.) Despite Dr. Ehtesham's diagnosis and assessment of GAF scores, Osborne continued to work until February 1, 2014, the alleged onset date of disability. (R. at 15.) The ALJ's failure to explicitly weigh Dr. Ehtesham's assessed GAF scores of 58 and 60 does not warrant remand in the present case. *See Clemins v. Astrue*, 2014 WL 4093424, at *19-20 (W.D. Va. Aug. 18, 2014) (finding that failure to discuss GAF scores did not warrant remand where the ALJ considered Plaintiff's mental health treatment records).

Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his residual functional capacity finding. Thus, I find that substantial evidence exists to support the ALJ's finding that Osborne was not disabled. An appropriate Order and Judgment will be entered.

DATED: March 19, 2020.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE